**UNITED STATES of America**

v.

**Hollman SUAREZ and Elena Cruz Suarez.**

**Cr.A. No. 487–85.**

United States District Court,
S.D. Georgia,
Savannah Division.

Aug. 26, 1988.

Asst. U.S. Atty. Michael Faulkner, Savannah, Ga., for U.S.

Edward R. Shohat, Miami, Fla., William T. Moore, Savannah, Ga., for Hollman and Elena Suarez.

## ORDER

ALAIMO, Chief Judge.

This Order supplements the Court's Order dated July 27, 1988, in which the Court

denied defendants' motion to suppress the cocaine discovered in a roadside search of their vehicle.

FACTS [1]

Hollman Suarez and his wife, Helen, were driving along Interstate 95 ("I–95") on the morning of August 17, 1987. At 1:00 a.m., the car was pulled over by a Georgia State Trooper, B.E. "Benjie" Hodges, ostensibly for speeding and weaving. Ultimately, Hodges obtained both defendants' signatures on a standard, English-language consent-to-search form; searched the car's passenger compartment and trunk; discovered a compartment hidden between the back seat and the trunk containing cocaine; and arrested the couple for cocaine trafficking. Approximately 29 minutes elapsed between the time Hodges signaled for the Suarez vehicle to pull over and the arrest.

Because the constitutionality of Hodges' actions turns on the details of those 29 minutes, a rather lengthy recitation of the facts follows.

Defendants were traveling north on I–95, while Hodges was traveling south. At approximately Mile Post 101, Hodges clocked defendants' vehicle at a speed of 68 m.p.h. on his radar. At the time, the posted speed limit was 55 m.p.h. Hodges made a u-turn across the freeway median and proceeded to catch up with the offending vehicle. While following Suarez traveling north, Hodges did not re-clock the vehicle; rather, he tailed Suarez for a short distance, called in the Florida tag number to his dispatcher and then signaled the driver to pull over onto the right-hand shoulder of the road.

Hodges was in a standard, marked Georgia State Patrol sedan and, throughout the encounter, the headlights remained on and the police lights atop the sedan remained flashing. Hodges was in uniform and armed.

Hodges walked up to the driver's side of the car and said to the driver, Hollman Suarez, "How 'bout stepping out with your driver's license, please sir." While Hodges chatted [2] with Suarez about stepping out of the car and moving back to the area between the two cars, Suarez informed Hodges, in English, that he did not speak English.

Hodges told Suarez that he "was running kind of fast and you was weaving," and asked, "Are you sleepy?" Suarez responded that he was not. The following exchange then took place:

Hodges: I wanted to check ya. We're having a lot of accidents, people, ya know, fall asleep and run off the road. Is this your car?

Suarez: No. It's my brother's

Hodges: Your brother's?

Suarez: Yeah.

Hodges: Okay. I'm gonna write ya a warning for weaving, okay?

Suarez: I don't speak English, my wife.

Hodges: Okay. I'll talk to her in just a second. Where you going?

Suarez: Eh, Savannah.

Hodges: Where?

Suarez: Savannah, Georgia.

Hodges: Savannah?

Suarez: Yeah.

Hodges: What part?

Suarez: Excuse me?

Hodges: Where in Savannah?

Suarez: Hold on [indicating that he was going to get his wife, Helen, to come out of the car].

Hodges: That's okay.

Suarez: No. It's okay? [And then in Spanish to Helen, "Stay there."]

---

1. The facts of this case are not disputed. Georgia State Troopers regularly videotape roadside stops with dash-mounted cameras; and the Court has before it a copy of the tape of this stop, along with a transcript of the conversation on the tape. Additional information was provided during a suppression hearing held on June 21, 1988.

2. "Chat" seems to be the most appropriate verb to describe Hodges' conversational manner with the Suarezes. As is discussed below, Hodges comes across as very affable and friendly, even disarming. It should be noted at this point that at no time during the encounter was Hodges intimidating in manner or tone towards the defendants. Indeed, it appears that one of the primary complaints regarding Hodges' actions is that he was too friendly.

During this conversation, Hodges was filling out the warning citation, which he ultimately issued to Suarez. He continued chatting while filling out the warning and discovered that Suarez was from Miami, that he was visiting a friend in Savannah and that he was unsure of the address he needed in Savannah.

Approximately four and a half minutes after the stop, Hodges returned Suarez's license to him, stating:

> Mr. Hollman, that's easier to say, right? [chuckle] This is a warning ticket. It doesn't cost you anything. It's just asking you to be more careful. You might want to let your wife drive if you're tired. I saw you weaving.
>
> Here's your license back.

Hodges then stated, "Okay, let me talk to your wife a minute," and handed Suarez the warning for him to sign. Hodges left Suarez standing between the cars and went up to the passenger side of the car, where he chatted with Helen Suarez. He asked her who owned the car, requested the registration papers for the car and asked where they were going. Her answers, and the registration papers she produced, corroborated Suarez's responses.

Hodges again asked where in Savannah the two were headed, stating to her, "Ask him what part of Savannah y'all are going to. I think y'all are lost." It was clarified by testimony at the suppression hearing that Hodges was puzzled by their statements that they were headed for Savannah because they had *passed* all of the Savannah exits.

Suarez, through his wife, gave Hodges an explanation for his uncertainty about their destination, stating that they were going to visit an unnamed friend in Savannah to deliver some auto parts catalogues. They were to check into a hotel, call Miami for the address and phone number of the friend and then contact the friend.

At this point, the elapsed time from the stop was just over ten minutes.

Hodges asked Mrs. Suarez to turn off the car and returned to his sedan to request a backup. He then asked her to step out of the car and to translate for him. He proceeded to explain the warning citation to her and then stated: "Okay, Ms. Suarez, would you ask your husband if it would be alright if I took a quick look in the car." She stated to Suarez in Spanish, "He asks if it's alright for him to look inside the car." Suarez responded in Spanish, "No problem."

This exchange occurred about twelve minutes after the initial stop.

The next ten minutes consisted of Hodges explaining the English-language consent-to-search form to Helen Suarez and of her giving an abbreviated explanation to Suarez in Spanish. Hodges initially asked her to read it and translate it; but after approximately a minute, suggested that he would read it to her in English and for her to then translate his reading into Spanish.

Although the consent form clearly states that one need not consent to the request to search, and that one has been instructed that he or she has the right to refuse such consent, these instructions were not translated to Suarez. The following excerpts contain all of the consent form discussion which was translated into Spanish by Helen Suarez:

> He says that this is a form that he has for his protection from his office for me to read to you.
>
> He says that he requests to look in the car and to give him the authorization for him to do it.
>
> [Suarez responded in Spanish, "Tell him it's alright."]
>
> He says, it's to make it more easy, so there's no problem.
>
> [Suarez responded, in English, "It's okay."]
>
> He says, this permission is written and given by him; that you let him inventory the inside without taking anything; and you are letting him do it.
>
> He says, that anything he finds in the car can be used against you.
>
> He says, if you are in agreement with it, sign there.

Suarez signed the form. Hodges also asked Helen Suarez to sign the form to

indicate that she had translated it for her husband.

Approximately 22 minutes after the initial stop, Hodges began the search. He began in the front seat area, briefly looked in the back seat area, then returned to the front seat and retrieved the keys from the ignition and opened the trunk. He looked inside a box, unzipped a suitcase and then partially entered the trunk. Less than five minutes after commencing the search, he located a "hidden" compartment. Hodges briefly returned to the back seat area, where he shone his flashlight behind the seat, corroborated the existence of the compartment and saw the packages of cocaine.[3]

Hodges arrested the couple for cocaine trafficking and read them their *Miranda* rights.

The defendants make a number of arguments for suppression. First, they argue that the traffic infraction was a pretext and that the stop was based on a drug courier profile rather than probable cause to believe a traffic infraction occurred. Next, they argue that, assuming the stop was valid, there was a second, unwarranted seizure after Hodges presented Suarez with the warning but continued to ask Helen Suarez questions leading to the consent request. Finally, Suarez argues that his consent was not knowingly made because of the inadequate translation of the consent form rendered by his wife and that the scope of the search far exceeded Suarez's consent, if any.

Defendants' arguments rely not only on the specifics of this encounter but focus, in part, on Hodges' reputation for obtaining consents to search and, ultimately, his success in uncovering drugs. And Benjie Hodges has *quite* a reputation.[4]

Hodges joined the Georgia State Patrol in June 1984, and has been on traffic patrol for approximately three years. He has had "considerable experience" with consent searches, estimating that he has conducted at least 100 searches based on either verbal or written consent and used written forms in 50–60% of the cases.

During his tenure, Hodges has made over 100 drug arrests and has acquired 65 "Lightning Bolts" on his patrol car, representing felony arrests while on traffic duty. He was named "Employee of the Year" based in substantial part on his success at intercepting drugs.

Of the 27 drug arrests made by the 12 troopers of Hodges' Troop 42 in 1988, Hodges made 25. As he readily admits, "most" of those arrests were made on I–95 and usually in the vicinity of Mile Post 102 at night. He acknowledged that, while his patrol area covers Chatham, Bryan and Effingham Counties, he usually remains on the freeway near Mile Post 102 and that he volunteers for the night shift, in part, because it is cooler than working during the day.

It is apparent that this particular stop followed a pattern which has proven successful for Hodges. After stopping a vehicle for a traffic infraction, Hodges more often than not issues a warning to the driver rather than a citation, chats with the driver in a folksy manner and then obtains permission to look into the car. If consent forms are used, Hodges downplays their importance by stating that the form is paperwork and that it is more for his protection than anything else. At the same time, Hodges also testified that, when travelers refuse to consent to a search, he no longer detains them but allows them to proceed without further questioning.

Defense counsel cites Hodges' statistics for issuing warnings rather than citations as illustrative of this pattern. In 1988, Hodges issued 171 warnings and 69 cita-

---

**3.** At the suppression hearing, Hodges testified that he did not notice the hidden compartment while he was searching in the back seat area and that he only noticed the compartment upon entering the trunk. The reasonable inference from his testimony is that, if he had not searched the trunk, he would not have found the cocaine.

**4.** Judge Edenfield described Hodges as "ubiquitous," *United States v. McBean,* —— F.Supp. ——, No. 487–97 [unpublished order] (S.D.Ga. Nov. 18, 1987); and the defendants describe him as a "veritable celebrity." After considerable thought, this Court will add "zealous" to Hodges' list of characteristics.

tions (72.2% warnings), while the 11 other troopers in the unit issued a total of 88 warnings and 357 citations (23.3% warnings). Not only does Hodges issue disproportionately more warnings, it appears that he stops a disproportionately larger number of cars. Of those 685 recorded stops, 240 (35%) are attributable to Hodges. Additionally, while 15% of the warnings issued by the other troopers were given to persons with Spanish surnames, 35.1% of Hodges' warnings were issued to persons with Spanish surnames.

The decision to issue a warning or citation is in the complete discretion of the trooper making the stop, and there was no evidence presented that the Georgia State Patrol has any guidelines as to how that discretion is to be exercised. Hodges did not provide any criteria for how he determines when to issue a citation as opposed to a warning, nor did he explain why he issued a warning rather than a citation to Suarez in this case.

Regarding the encounter with the Suarezes, Hodges stated that he initially pulled the car over for speeding. He stated it was standard practice at the time to stop all cars exceeding the 55 m.p.h. limit by 10 m.p.h. or more.[5] He denied pulling them over based on any sort of drug courier profile. When asked if he planned to search the car upon pulling it over, he responded, "No." When asked to identify the actual time he decided to seek a search consent, he admitted he could not pinpoint it. Rather, he stated that the decision was based on the cumulative effect of a number of incongruities. Primary among them was Suarez's statement that he was going to Savannah after having missed the last Savannah exit, later reinforced by the couple's rather convoluted explanation about how they were to contact their friend upon arrival in Savannah.

DISCUSSION

Defendants' motion to suppress the cocaine is based on the Fourth Amendment, which states, in part:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause....

U.S. Const., amend. IV.

By definition, the searches and seizures which violate the amendment are those which are *unreasonable*. *See also Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) ("The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security.'") (*quoting Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968)). Although certain intrusions are presumptively unreasonable unless authorized by a duly-procured warrant based upon probable cause, *see Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (absent exigent circumstances, an entry into private premises to effect routine felony request requires warrant), there are numerous exceptions to the Fourth Amendment's warrant and probable cause requirements.

*Warrantless Searches*

The occurrence of a custodial arrest provides the most common exception to the warrant requirement for searches. *See Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (upon lawful arrest police may search anywhere within the arrestee's "grab area"); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (upholding search under *Chimel* of a person arrested for driving without a license); *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (*Chimel* grab area extends to entire passenger compartment of car, and all containers therein, upon lawful custodial arrest). *But see United States v.*

---

5. The Court notes that, in the summer of 1987, the states were in the process of raising the speed limit on portions of interstate expressways in accordance with relaxed Congressional guidelines. Because the Florida and South Carolina stretches of I–95 had already been raised to 65 m.p.h., the Georgia State Patrol had a policy of allowing drivers on the Georgia stretch of the expressway to travel at a speed *not exceeding* 65 m.p.h.

*Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932) (where liquor agents arrested bootlegger in his office pursuant to a valid arrest warrant but conducted a complete search of his records and files, the Court suppressed, stating, "An arrest may not be used as a pretext to search for evidence.").

Additionally, warrantless searches are valid if incriminating evidence is in plain view, if an officer has probable cause to believe such evidence is in an automobile and where officers inventory impounded vehicles or arrested persons.

A more important exception, for the purposes of the instant motion, are searches based upon the consent of the detainee. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), is the seminal case governing consent searches. In *Bustamonte*, a police officer stopped a car at 2:40 a.m. for equipment violations (one headlight out and no tag light). The driver did not have his license and, when he and the five passengers alighted, only one had identification. After two backup officers arrived, the stopping officer asked for permission to search the car. The atmosphere was "congenial" and the consent was "freely, even casually given." *Id.* at 221, 93 S.Ct. at 2044. The occupants assisted with the search by getting the keys when the officer asked if the trunk opened. In the trunk, the officer found crumpled stolen checks.

Defendants argued that the consent was invalid because they were not informed of their right to refuse to consent to the search. The California courts rejected the argument and used the following test for analyzing a consent to search:

Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority, is a question of fact to be determined in light of all the circumstances.

*Id.* at 221, 93 S.Ct. at 2044, quoting Justice Traynor in *People v. Michael,* 45 Cal.2d 751, 290 P.2d 852 (1955).

On *habeas,* the Ninth Circuit ruled that California's test was inadequate. The court held that, in order to establish a valid consent, the Government must show, in addition to a lack of coercion, that the consent was given with an understanding that it could have been freely and effectively withheld.

The United States Supreme Court reversed. Initially, the Court reiterated two principles: (1) a consent search is a valid exception to the Fourth Amendment's warrant and probable cause requirements; and (2) the Government has the burden of proving a valid consent. In reversing the Ninth Circuit's "knowledge requirement," the Court stated:

[T]he question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.

*Bustamonte,* 412 U.S. at 227, 93 S.Ct. at 2047–48.

The Court specifically rejected a requirement that officers affirmatively inform detainees of their right to refuse consent, reasoning, "it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning." *Id.* at 231, 93 S.Ct. at 2050. The Court also rejected the test developed in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), which holds that *waiver* of certain constitutional rights is subject to an "intentional relinquishment of a known right or privilege" standard. 412 U.S. at 235, 93 S.Ct. at 2052.

The Court indicated that the following factors are relevant to the inquiry of whether consent was voluntarily given: the person's youth, his lack of education, evidence of the person's low intelligence, the existence of advice as to the nature of the constitutional right implicated, the length of the detention preceding the request for consent, the nature of prior questioning, the environment and whether any physical

punishment was involved. *Id.* at 226, 93 S.Ct. at 2047.

■ A corollary to the law of consent searches is that the extent of a consent search can be limited by the scope of the permission given. *United States v. Millian–Rodriguez,* 759 F.2d 1558 (11th Cir. 1985). Although it is clear that one can limit the extent of the search, there appears to be some disagreement as to whether the Government or the consenter bears the burden of establishing the parameters of the consent and, thus, the propriety of the search of any given area. *Compare United States v. Kapperman,* 764 F.2d 786, 794–95 (11th Cir.1985) (search of suitcase in trunk was within permission given where object of search—narcotics—was known to the consenter and permission was granted for a "complete" search of automobile. The court stated: "Moreover, there is no indication that [consenter] objected to the opening of the suitcase or that he intended to limit the search...."), *with United States v. McBean,* No. 487–97 [unpublished order] at 19 (S.D.Ga. Nov. 18, 1987) (Judge Edenfield ruled that the scope of a consent search did not extend to a suitcase in the trunk because Trooper Hodges specifically omitted reading to the defendant that portion of the consent form which states that containers may be opened. Judge Edenfield stated: "As a matter of fact, it cannot be stated that defendant's failure to object under the circumstances of this case indicated his acquiescence to a search of the luggage. The trooper had no right to look inside the luggage from the outset, and an objection should not be required to prevent that which the trooper already had no right to do.").

■ Consistent with the policy that exceptions to the warrant and probable cause requirements of the Fourth Amendment should be narrowly construed, the better view is that, when the Government is relying on consent for a search, the Government has the burden of showing both that the consent was voluntary and that the scope of the consent encompassed the area searched.

■ While *Bustamonte* establishes the necessary showing for a valid consent search when the police are legitimately present, if the citizen is illegally detained, a higher showing must be made. In cases where the police illegally detain a citizen, it follows that the consent obtained often will be the fruit of the illegal detention. *See Won Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In those situations, not only must the Government establish that consent was voluntarily given, it must also show that there were intervening circumstances sufficient to dissipate the taint of the illegal detention. At a minimum, it appears that the Government is required to show that the suspect knew he could refuse consent, if not show that the officer affirmatively informed the suspect of his or her right to refuse. *See United States v. Berry,* 670 F.2d 583 (5th Cir. Unit B 1982).

### Seizures of the Person

The spectrum of police/citizen encounters covers voluntary interactions between citizens and law enforcement officers at one end and actual or constructive arrests of criminal suspects at the other. While the Fourth Amendment is not implicated in the former, the existence of probable cause is necessary for the latter.

■ A police officer typically can arrest a suspect in public without a warrant if the officer has probable cause to believe a felony has been committed and probable cause to believe that the suspect committed the crime. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Additionally, it has long been held that an officer can arrest a suspect for committing a misdemeanor in the officer's presence. *See Street v. Surdyka,* 492 F.2d 368 (4th Cir.1974) (authorizing arrests for misdemeanors occurring *outside* of the officer's presence); *see also Watson, supra* 423 U.S. at 418, 96 S.Ct. at 825 (dealing with a felony arrest but repeating the Common Law misdemeanor rule in *dicta* ); *cf. United States v. Smith,* 799 F.2d 704, 708 (11th Cir.1986) (stop of vehicle is proper where

officer has probable cause to believe the misdemeanor traffic infraction occurred and reasonable officer *would* have stopped the car).[6]

In between the extremes of voluntary encounters and full arrests are those "seizures" which invoke the reasonableness standard of the Fourth Amendment but which, because of their limited intrusiveness, do not require a complete showing of probable cause. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

A seizure occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut,* —— U.S. ——, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (*quoting United States v. Mendenhall,* 446 U.S. 544, 560, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980)). In *Chesternut,* the Court found that the scenario of a marked police sedan following a suspect around a corner and cruising alongside him as he ran along the footpath did not constitute a seizure. Perhaps more significantly, the Court reemphasized that Fourth Amendment inquiries are exceedingly case-specific: "Rather than adopting either rule proposed by the parties ... we adhere to our traditional contextual approach." *Id.*

Before making these limited seizures, police officers must have a "particularized and objective basis for suspecting [the citizen] of criminal activity." *Id.,* 108 S.Ct. at 1981 (*quoting United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Courts have found the reasonable-suspicion standard satisfied in a variety of contexts. *See, e.g., Terry, supra* (loitering and apparent casing of a storefront warranted a brief exterior frisk for weapons); *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (heavily laden trailer traveling in tandem with a sedan provided reasonable suspicion of drug trafficking to authorize

tailing the pair for 20 minutes; evasive action warranted stopping the vehicles and holding driver for 15 minutes while DEA agent arrived); *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (although the Court found the particular stop unjustified, it approved the practice of stopping cars near the international border for brief questioning if there is reasonable suspicion that the vehicle contains illegal aliens); *Cortez, supra* (upholding border patrol stop based on time of night and nature of vehicle).

In often-quoted language, courts return to *Terry* to evaluate the propriety of varied forms of investigative detentions, asking:

> [w]hether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

*Terry, supra,* 392 U.S. at 20, 88 S.Ct. at 1879.

It is not uncommon for a particular police/citizen encounter to progress from one level in the spectrum to another. Identifying if and when such a progression has occurred and determining whether the requisite showing of cause to justify the enhanced intrusiveness has been established are, again, exceedingly case-specific inquiries. *See, e.g., Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (In a plurality decision, the Court held suppression was warranted. Four Justices ruled that, without probable cause, defendant's detention progressed from a voluntary encounter to what, "as a practical matter," constituted an arrest. Under the circumstances, his consent to search his luggage was insufficient to dissipate the taint of the illegal detention.).

Lastly, the Court notes two Eleventh Circuit decisions discussing I–95 drug courier stops. Both involved a Florida State

---

**6.** As noted above, if the arrest, including a traffic arrest, constitutes a lawful *custodial* arrest, "*i.e.,* a seizure of a person with the intention of thereafter having him transported to the police station or other place to be dealt with according to law," 1 LaFave & Israel, *Criminal Procedure*

§ 3.5 at 248–49 (1984), the warrantless arrest allows for a contemporaneous search of the person and car. *Belton, supra.* The stop in this case was noncustodial. *See infra* at pp. 937–38.

Trooper, Robert Vogel, who admitted he stopped the cars based on a profile match.

In *United States v. Smith*, 799 F.2d 704 (11th Cir.1986), Vogel stopped the car ostensibly for weaving and briefly crossing over the shoulder-marker white line. However, Vogel admitted that he pulled the car over because he felt the car and driver met a profile match.

After stopping the car, Vogel learned that the rental agreement had expired. Vogel made some radio inquiries and held the driver until DEA agents arrived and an exterior dog sniff established probable cause that drugs were inside.

The district court found that the traffic violation was a pretext for the stop, but essentially held that the stop was valid under *Terry*, believing that the courier profile match provided sufficient suspicion for an investigative detention. The Eleventh Circuit disagreed, finding that the factors relied on by Vogel were descriptive of innocuous behavior, thus insufficient to warrant the stop, stating:

> Vogel's suspicion therefore was not the result of "reasonable inferences" from "unusual conduct," but was instead a classic example of those "inarticulate hunches" that are insufficient to justify a seizure under the fourth amendment.

*Id.* at 707 (*quoting Terry*, 392 U.S. at 27, 30 & 22, 88 S.Ct. at 1883, 1884 & 1880).

The court agreed with the district court that the traffic infraction was a mere pretext for the stop. The court reiterated that Fourth Amendment analysis focuses on objective factors and not subjective motivations, quoting then-recent Supreme Court language:

> "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." The resolution of this case thus depends upon whether Trooper Vogel's stop of [Smith's] car was objectively reasonable.

*Id.* at 709 (*quoting Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985)).

Ultimately, the court analyzed the evidence "[b]y looking to what a reasonable officer *would* do rather than what an officer validly *could* do," *id.* at 711 (emphasis in the original), and found that the traffic infraction was a pretext.

The court repeated the objective test in *United States v. Miller*, 821 F.2d 546 (11th Cir.1987), and again summarily found that the alleged traffic infraction was a pretext for a profile stop. Vogel admitted he determined to pull the car over based on a profile match, then followed the car and waited for a weaving violation to occur.

*Miller* is significant because, after the stop, Vogel obtained a signed consent-to-search form and the Government argued that, regardless of the pretext, the consent authorized the search. The court disagreed and ruled that, under the circumstances—primarily the temporal proximity between the initial detention and the consent—the taint of the illegal detention was not sufficiently attenuated and, as a result, the evidence obtained pursuant to the consent constituted suppressible fruit.

■ In summary, it is fair to say that rules of "objectivity," "proportionality" and "limitations" predominate when determining reasonableness under the Fourth Amendment: *i.e.*, (1) the discrete inquiries of whether a traffic stop is based on a pretext or an actual infraction, whether reasonable suspicion or probable cause exist, whether a seizure or arrest has occurred and whether consent is coerced or voluntary are all determined by objective rather than subjective criteria; (2) the scope of a permissible police intrusion is proportional to the factors giving rise to suspicion of illegal activity; and (3) the extent of the intrusion is limited to effectuate the purposes which authorized the officer's encounter with the detainee.

### Initial Stop of the Suarez Car

■ The Court concludes that Hodges' initial stop of the Suarez vehicle was valid. The Court credits Hodges' testimony that

he pursued the car and determined to pull the driver over because he was traveling in excess of 10 m.p.h. above the posted speed limit.[7] Because it was standard procedure to stop cars when they traveled above 65 m.p.h., in the terms of *Miller* and *Smith*, the Court finds that a reasonable officer would have stopped the car regardless of any other impermissible motivations.

In addition to Hodges' testimony, this determination is supported by the complete lack of evidence that "profile factors" were apparent to Hodges at the time he made the decision *to stop* Suarez. At the time Hodges clocked the vehicle on his radar, in darkness and traveling in the opposite direction on the widely divided interstate highway, Hodges *could not have known* that the car was registered out-of-state, that the driver was Hispanic or that the car was owned by a third person. Indeed, at the time Hodges made his u-turn across the median, the only arguable profile factor was a car traveling on I–95 at night.

The Court is not persuaded that the discrepancy between giving Suarez a warning for weaving and Hodges' explanation that he stopped the defendant for speeding bears any significance on the issue of whether the initial stop was valid. As the videotape establishes, Hodges told both defendants that Suarez "was running kind of fast," as well as weaving, when he issued the warning. As was established, Hodges had complete discretion whether to issue a warning or a citation, and the fact that he chose to warn for one infraction and not the other appears irrelevant.[8]

Nor is the Court persuaded that Hodges' overall abundance of traffic stops undermines the conclusion that *this particular stop was valid.* As noted, Hodges made 35% of all stops made by the 12 troopers in his unit where citation or warnings were issued. If all 12 troopers perform equal traffic duty, one could assume that each would be responsible for roughly 8% of all stops and that Hodges, statistically, is more than four times as likely to stop travelers. In isolation, however, the statistic is meaningless. There was no evidence presented that the other 11 troopers perform traffic duty, nor evidence as to the relative degree of traffic duty performed by the various troopers.

Assuming, *arguendo*, that Hodges does stop a disproportionately larger number of vehicles, it does not follow that his stops are pretexts for courier stops. A reasonable inference arising from the abundance of stops is that Hodges is more willing to work while on duty, rather than to sit idle on the fringe of the expressway.

Finally, the Court does not agree that Hodges' propensity for issuing warnings rather than citations indicates that Hodges' decision to stop a particular car is objectively unreasonable. The *Smith* test asks whether, absent an impermissible motive, would the officer have *stopped* the vehicle. Hodges' testimony, which the Court credits, was that the decision to warn rather than cite is made some time after the initial stop. While the disproportionately large number of warnings may bear relevance to the analysis of Hodges' post-stop activities, that statistic appears irrelevant to the *Smith* and *Miller* question addressed here.

---

**7.** The Court notes that Hodges is a credible witness. His intelligence, demeanor on the stand, candor and attentiveness to the questions of counsel and the Court, factors which federal judges regularly instruct jurors to consider when assessing credibility, *see* Devitt & Blackmar, *Federal Jury Practice & Instructions* § 17.01 (1977), reinforce this conclusion.

**8.** The Court can only speculate as to the relative purposes between issuing warnings rather than citations. It seems sensible, however, to conclude that, if road safety is the ultimate goal of traffic stops, that goal will be served by the actual stop and "lecture" given to the driver. The formal issuance of a warning would appear to be a way to reinforce what the officer tells the driver and to add a patina of seriousness to the encounter. In the instant case, Hodges testified that he clocked the Suarez vehicle traveling three m.p.h. over the speed which the Patrol deemed allowable, *see* n. 5 *supra*, and he stated to the couple that they were "running kind of fast," as well as weaving. He asked the driver (Hollman Suarez) whether he might be tired or sleepy. Hodges' decision to issue a formal warning for weaving does not appear to be sufficiently inconsistent to suggest that he did not initially stop the car for other than traffic infractions.

### *Permissible Scope of the Initial Stop*

■ There is a dearth of authority regarding the permissible scope of police conduct upon making a valid, non-custodial traffic stop. Because traffic stops are typically non-custodial, the officer lacks the authority to search the person pursuant to *Robinson* or to search the car pursuant to *Belton*. At the same time, because an actual infraction has occurred, as opposed to mere suspicion of criminal activity, the limitations of *Terry* and its progeny are not necessarily applicable. In the end, the Court must, under the basic tenets of the Fourth Amendment, look to the justifications giving rise to the stop to determine the scope of the permissible intrusion.

Initially, the Court notes, notwithstanding other permissible actions, the officer can order the driver out of the car, *Pennsylvania v. Mimms, supra;* and common sense dictates that the officer can request to see the driver's operating license and the car's registration papers. Additionally, various authorities indicate that it is permissible to question the driver generally about his presence on the road and, specifically, about any suspicious activity.

The statute which governs traffic citations inferentially authorizes the questioning of a driver. In Georgia, most traffic infractions are dealt with under the typical traffic procedure of bond forfeiture. *See* O.C.G.A. §§ 40–13–53, 40–13–58. Indeed, with limited exceptions (*e.g.,* driving under the influence, speeding in excess of 15 m.p.h. over the posted limit and registration violations), drivers must be released upon service of the citation and complaint unless the officer has grounds to believe that the driver will not comply with the bond-forfeiture procedure. O.C.G.A. § 40–13–53(a). It appears to the Court that, to make the determination at the time of the stop whether a driver will comply with the procedure, the officer is authorized to question the driver regarding his or her residency, occupation and destination.

The *Terry*-stop cases cited above also support the practice of questioning during a traffic stop. There, concededly without probable cause, officers stopped citizens and questioned them and, in one case, simply held the citizen for over 15 minutes. *Sharpe, supra.* It follows that, if such detentions and questioning are permissible in the absence of probable cause, similar police conduct is permissible when the stop is independently justified.

In the instant case, it is clear to the Court that Hodges' conduct during the 12 minutes between the stop and the granting of consent fell within the permissible scope of a non-custodial traffic stop. Hodges asked Suarez to step out of the car, sought information about the car's ownership, asked for a driver's license and questioned him generally regarding their destination. All of these actions were permissible.

### *A Second Seizure "?"*

■ The defendants appear to concede (assuming that the initial stop is not a pretext) that Hodges' actions were permissible up to the point where he actually gave Suarez the warning but argue that a second, unwarranted seizure occurred when Hodges further detained Suarez while Hodges spoke with Helen Suarez. The Court disagrees that this encounter can be broken down into two discrete seizures.[9]

---

9. Even if the Court were to find that it is possible to view this encounter as consisting of a justified traffic stop and then a second, investigative detention, the Court would find that a second seizure was justified *under the circumstances* existing at the time.

   As noted above, the propriety of an investigative detention turns on the magnitude of the intrusion related to the justifications for the detention. Here, the excess intrusion consisted of just over five minutes while Hodges spoke with Helen Suarez. The detention was justified, in part, by Hodges' attempt to ascertain the couple's destination. In this particular situation, Hodges' attempt to learn their destination, from an objective viewpoint, was potentially beneficial to the couple (assuring they were not lost), as well as investigatory (verifying or dispelling a suspicion that the proffered destination was a subterfuge).

   Admittedly, the fact that travelers unfamiliar with an area are lost does not immediately denote "suspicious activity." *But see Sharpe, supra* (the fact that a camper rides low, indicating that it is heavily laden, seems equally innocuous, but that fact provided some justification for the ensuing stop). In this case, however, the fact that the couple may be lost *should* evoke a

Several factors undermine a finding of a second seizure in this case. First, it must be noted that it was *Suarez* who suggested that Hodges speak with his wife, rather than Hodges' unilateral decision to interrogate her as defendants assert. Secondly, a careful review of the videotape establishes that there was not a natural break in the encounter between giving Suarez the warning and Hodges' conversation with defendant's wife. The videotape establishes that Hodges handed the warning to Suarez for his signature—the traffic stop was not yet complete—and, while Suarez reviewed the warning, Hodges walked over to the passenger side window and began his conversation with Helen Suarez.

The questions Hodges asked her were a natural extension of the continuing traffic stop. He first asked for the registration papers for the car; as noted, car registration violations are one of the express exceptions to the bond-forfeiture procedure used in Georgia. While defendants correctly note that Hodges could have asked for the registration papers when he initially asked Suarez to step out of the car, the Court finds no impropriety in Hodges' decision to ask to review them after giving Suarez a warning.

The fact that Hodges repeated the same questions, rather than started a new line of questioning, reinforces a finding that his questions to her were part of the one traffic stop; and, to this Court, reinforces the conclusion that Hodges was troubled by Suarez's assertion that he was headed for Savannah. Hodges asked Helen Suarez to find out where in Savannah they were headed, stating, "I think y'all are lost." As noted, *supra* n. 9, it would be anomalous, if not exceedingly unprofessional, for a traffic officer to have information which leads him to believe travelers are lost, issue a warning to drive more carefully, ignore the information and then send them on their way.

Finally, *Mimms* and *Robinson* strengthen the conclusion that there was but one

response from a law enforcement officer who can direct the travelers to the proper route once

stop here and that Hodges' actions were within the permissible scope of that stop.

In *Mimms*, a driver was stopped for driving with expired tags. Although the officer admitted that he had no basis for suspecting that the driver was armed or dangerous, the officer ordered the driver out of the car pursuant to his, and the police force's, regular practice. When the driver alighted, the officer noticed a bulge in the driver's pants which indicated a gun. The officer frisked the driver, removed the gun and arrested the driver for possession of a concealed and unlicensed revolver. He was convicted. Defendant moved to suppress, arguing that the officer had no basis for ordering him out of the car. The United States Supreme Court disagreed, stating:

> Deferring for a moment the legality of the "frisk" once the bulge had been observed, we need presently deal only with the narrow question of whether the order to get out of the car, issued after the driver was lawfully detained, was reasonable under the Fourth Amendment. This inquiry must therefore focus not on the intrusion resulting from the request to stop the vehicle or from the later "patdown," but on the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped.
>
> \*   \*   \*   \*   \*   \*
>
> [W]e are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as *de minimis*.

*Pennsylvania v. Mimms*, 434 U.S. at 109, 111, 98 S.Ct. at 332, 333.

In *Robinson*, a driver known to the officer to have had his license revoked was stopped for driving without a license. The governing statute mandated that the officer take the driver into custody for driving without a valid license. Accordingly, after stopping the vehicle, the officer arrested

satisfied they are, indeed, lost.

the driver and frisked him. The officer found heroin.

The defendant argued that the frisk was unwarranted under *Terry*, because the officer had no cause to believe that he was armed and dangerous simply because he was driving with a revoked license. The Court rejected the argument, reasoning that the validity of the *custodial* arrest, regardless of the crime on which it was based, authorized the protective and warrantless search. Again, because the initial intrusion (the custodial arrest) was valid, the additional, incremental intrusion, while not a "petty indignity," was justified. *See also Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

*Gustafson* is a companion case to *Robinson* where the police officer stopped the driver for weaving. The driver did not have his license with him, whereupon the officer arrested him and conducted a patdown search. Unlike *Robinson*, where the officer was required to make a custodial arrest, the officer in *Gustafson* had the discretion whether to arrest or to cite the driver. During the protective search, the officer found marijuana cigarettes which led to the defendant's conviction for drug possession. Relying on *Robinson*, and ignoring the discretionary decision to arrest, the Court found the search permissible under the search-incident-to-arrest rationale.

While none of the above decisions is directly on point, each reinforces the Court's conclusion that Hodges' actions were permissible. The length of time between handing the warning to Suarez and the request for a consent search was less than six minutes. As an increment to the initial intrusion of being stopped on the freeway, the additional period of time constitutes a *de minimis* intrusion. Hodges validly stopped the defendants and was seeking to perfect legitimate purposes inherent in a traffic stop; that is, verifying the car's registration and ensuring that the couple were not lost. Finally, Hodges' manner throughout the six minutes alleviated, rather than enhanced, any intrusiveness occasioned by any excess detention.

The Court can find no fault with Hodges for extending the stop for the time it took to ask Helen Suarez the few questions involved here, and finds that Hodges' actions fulfill the "reasonableness" standards of the Fourth Amendment.

### Consent to Search

■ Because Suarez was not illegally detained, the validity of his consent to search is governed by the lack-of-coercion standard of *Bustamonte* and not the dissipation-of-taint standard of *Miller* and *Berry*. Although the Court agrees with the defendants that the Government cannot rely on the *signed* consent form to establish the voluntariness or scope of Suarez's consent,[10] the Court ultimately concludes that Suarez's *oral* consent authorized the search conducted by Hodges.

■ The lack of coercion is evident at once in this case. Indeed, there appears to be no argument that, apart from the normal trappings of a nighttime traffic stop, there were not any coercive elements involved in this case. Clearly, Hodges' manner was friendly; Suarez was not alone; he is not young; and there was no evidence presented that he lacks normal intelligence. In many ways, the situation mirrors *Bustamonte*. Suarez was informed by his wife that Hodges "asks if it's alright," and "requests" to look in the car. The atmosphere was congenial and Suarez freely, even casually responded, "Okay." Indeed, because Suarez orally consented to Hodges' request (as translated by his wife) prior to the arrival of a backup officer, the instant situ-

---

**10.** It is inappropriate to rely on the terms of the English-language consent form where so little of that form was translated to Suarez. Hodges admitted that Spanish-language consent forms are available, and Hodges should have obtained one if he was intending to rely on it. To the extent that the defendants argue that Hodges intentionally used an English-language form as a tactic to obtain consent, the Court disagrees.

Hodges testified that he usually has Spanish-language forms available but did not have one that night. The Court credits that testimony as true and finds that Hodges, in good faith, attempted to have the terms of the form translated to Suarez. At the same time, a review of the transcript of the conversation establishes that few of the terms contained in the form were adequately translated.

ation has one less "coercive feature" than *Bustamonte* where the two backup officers arrived prior to the request and consent.

The Court easily concludes that Suarez's consent was voluntarily given and was not the result of coercion, either expressed or implied.

Rather than focusing on coercion, the defendants urge the Court to focus on an alleged ruse, or pattern, whereby Hodges obtains consents. The substance of the argument asks the Court to hold that police ingratiation violates the Fourth Amendment. This the Court will not do.

Defendants argue that, once Hodges legitimately stops a driver for a traffic infraction, he should limit his conversation solely to information necessary to write up a citation, cite the driver and be on his way. The corollary is that Hodges should appear to be serious and "cop-like," rather than attempting to come across as a "good ol' boy"; and that his manner, commencing with the decision to let the driver off with a mere warning, constitutes an impermissible misrepresentation.

The Court simply cannot find any basis in law, or common sense, for that argument. Assuming that Hodges' actions constitute a ruse, the simple response is that police ruses are the bases for all undercover operations, which have been upheld as permissible and potent weapons for fighting crime. The Supreme Court has defined "voluntariness" for the purposes of consent in the negative; that is, a consent is voluntary if it is *not* the "product of duress or coercion, express or implied." *Bustamonte*, 412 U.S. at 227, 93 S.Ct. at 2048. A consent based on the false assumption that the police officer is your friend, or that he or she lacks the intelligence to find what you have hidden, may be inadvisable but it is not the result of duress or coercion.

### Scope of the Consent

■ Defendants argue a number of interrelated factors to establish that Hodges exceeded the scope of Suarez's consent. They point out that Hodges initially sought to take a "quick look in the car" and that Helen Suarez used the Spanish verb "mirar," which means "to look," as opposed to "escundrinar" or "estudiar," which means "to search" or "to look into," when she translated Hodges' request. Defendants also argue that permission to search a "car" is limited to the passenger compartment and excludes the trunk.

It appears to the Court, however, that defendants fail to credit any of the remaining conversation between Hodges and Suarez, which establishes that Suarez consented to a complete search of the car. Although Hodges asked for a "quick look," Suarez's wife stated to him, "He asks if it's alright for him to look inside the car." She did not qualify the request by "quick." Subsequently, she told Suarez that his consent also authorized Hodges to *inventory* the inside, without taking anything, and that anything Hodges found in the car could be used against Suarez.[11]

11. When explaining that portion of the form to Helen Suarez, Hodges used a gun as an example of an object which could be used against Suarez if discovered during the search. Although the defendants *ignore* the fact that Helen Suarez did not translate that example to her husband, defendants argue that Hodges' example again misrepresented the nature of the search and that *United States v. Kapperman*, 764 F.2d 786 (11th Cir.1985), supports their argument that the scope of the search exceeded the scope of the consent because of the misrepresentation. Their reliance on *Kapperman* is misplaced. As noted, *supra* p. 933, the court in *Kapperman* found that the consent encompassed a suitcase, in part, because the object of the search was known to the consenter. Because narcotics can fit into suitcases, it was reasonable to assume that the permission granted encompassed such containers.

As Justice Stevens illustrates in *United States v. Ross*, 456 U.S. 798, 821, 102 S.Ct. 2157, 2171, 72 L.Ed.2d 572 (1982), the object of the search defines the *spatial limitations* to the search ("Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chest, drawers, and containers in which the weapon might be found.").

Here, Hodges used an example of a gun. Anywhere that a gun can be secreted, packages of cocaine would fit. As such, his use of a gun as an example was not misleading as to the scope of the search, which is the question at hand. To further illustrate, if Hodges had stated that the purpose of the search was to check for stolen television consoles and the consent to

'As noted, Suarez freely and casually gave his consent to Hodges' request. Considering the information known to Suarez when he repeatedly consented—that the search included an inventory and the possibility that incriminating evidence would be used against him—the Court finds that a reasonable interpretation of the circumstances is that Suarez consented to a complete search of the car.

The Court also concludes that the reasonable interpretation of a consent to a search of the car included consent to search the trunk. The Court is supported by Judge Edenfield's thoughtful determination:

> [Defendant's] consent was to "a look in the car." The scope of the search is limited by the scope of the consent, and in this case, the scope of the consent given was limited by the scope of the request made. The Court has considered the reasonable meaning of Hodges' request to "a look in the car." It would be dishonest to construe "a look in the car" as indicative of anything other than *a look in the car*. Thus, fair interpretations of the request may include the trunk of the car, under its seats, or in the glove compartment....

*McBean, supra* at 8 (emphasis in the original).

CONCLUSION

Suppression of incriminating evidence is a powerful tool available to the judiciary to ensure that criminal defendants are assured due process under the law. While it was once considered proper to suppress illegally obtained evidence to maintain the integrity of the Court by insuring that the Court was not party to violations of the Constitution, *Elkins v. United States,* 364 U.S. 206, 222–23, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the principle rationale of the exclusionary rule is to deter future unlawful police conduct. *Illinois v. Krull,* 480 U.S. 340, 347, 107 S.Ct. 1160, 1165, 94 L.Ed.2d 364, 373 (1987); *see also Illinois v. Gates,* 462 U.S. 213, 259 n. 14, 103 S.Ct. 2317, 2343 n. 14, 76 L.Ed.2d 527 (1983) (White, J., concurring) (maintaining that

the two rationales are not inconsistent and that both are served by focusing on the deterrence prong).

Under either rationale, a predicate to suppressing evidence is a finding that a constitutional violation occurred. In this case, no such violation occurred. Benjie Hodges may be a zealous police officer but, in this situation at least, he remained within the bounds of permissible police conduct. He stopped a car for a traffic infraction and, shortly thereafter, obtained a valid consent to search the vehicle. Under the basic constitutional mandate that citizens will be free from unreasonable searches and seizures, and under the discrete inquiries applicable to the Fourth Amendment, the Court finds that Hodges' actions were reasonable. Accordingly, defendants' motion to suppress the evidence obtained during the search is DENIED.

such a search were granted, it would be impermissible for Hodges to look into the glove compartment or inside suitcases—places where stolen televisions could not fit.